Slip Op. 16 - 73

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| GOLDEN DRAGON PRECISE COPPER TUBE GROUP, INC., HONG KONG GD TRADING CO., LTD., GOLDEN DRAGON HOLDING (HONG KONG) INTERNATIONAL, LTD., and GD COPPER (U.S.A.) INC., | : : : : : : : | |
| Plaintiffs, | : : | Before R. Kenton Musgrave, Senior Judge |
| v. | : : : | Court No. 15-00177 |
| UNITED STATES, | : : | |
| Defendant. | : : | |

## OPINION AND ORDER

[Remanding final results of administrative review for further explanation or reconsideration.]

Dated: July 21, 2016

*Kevin M. O'Brien*, *Christine M. Streatfeild,* and *Yi Fang*, Baker & McKenzie, LLP, of Washington DC, for the plaintiffs.

*Michael D. Snyder*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for the defendant.  With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of Counsel on the brief was *David P. Lyons*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Musgrave, Senior Judge:  The plaintiffs, Golden Dragon Precise Copper Tube Group,

Inc. (*et al.*; collectively "Golden Dragon"), challenge several aspects of *Seamless Refined Copper*

*Pipe and Tube From the People's Republic of China*, 80 Fed. Reg. 32087 (Jun. 8, 2015) (final

results of 2012-2013 admin. review) ("*Final Results*") as stated in the accompanying issues and

decision memorandum ("*IDM*") on the administrative record compiled by the defendant's International Trade Administration, U.S. Department of Commerce ("Commerce" or "the Department").  The *Final Results* cover the third administrative review of subject merchandise which covers the period of review ("POR") from November 1, 2012 to October 31, 2013.  Golden Dragon was selected as the sole mandatory respondent at the administrative outset, and the proceeding resulted in a weighted average margin for Golden Dragon of 10.50%.  *Final Results*, 80 Fed. Reg. at 32088.

Golden Dragon timely invokes the jurisdiction of the court under 19 U.S.C. §1516a(a)(2)(B)(iii) and 28 U.S.C. §1581(c).  Its complaint challenges the administrative determinations to (i) make an unrecovered Value Added Tax ("VAT") adjustment of 4 percent to Golden Dragon's U.S. sales, (ii) apply the byproduct offset for recovered copper to normal value rather than to direct material costs, and (iii) rely upon a truck freight surrogate value that differed from a truck freight rate used previously.  On such matters, the court will sustain an administrative determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law".  19 U.S.C. §1516a(b)(1)(B)(i).  This opinion remands for further explanation or reconsideration of Commerce's VAT determination.  Each issue is addressed in turn, as follows.

I. *Irrecoverable VAT Deduction*

A. Background

In determining the dumping margin applied to producers or exporters from non-market economies ("NME"), Commerce must determine the export price ("EP") or constructed export price ("CEP") of the subject merchandise, or the price at which the subject merchandise is sold in the United States.  19 U.S.C. §1677b(a).  Commerce treats the People's Republic of China

("PRC") as a NME.  Decision Memorandum for Preliminary Results, PDoc 98 ("Prelim IDM") at

6.  Both EP and CEP are then to be adjusted by reducing EP or CEP by, *inter alia*, "the amount, if

included in such price, of any export tax, duty, or other charge imposed by the exporting country on

the exportation of the subject merchandise to the United States". 19 U.S.C. §1677a(c).  Commerce's

stated practice in determining such reductions is to adjust EP or CEP for the amount of any

(irrecoverable) value-added tax ("VAT") in certain NME countries, in accordance with 19 U.S.C.

§1677a(c). *See Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act*

*of 1930, as Amended, in Certain Non-Market Economy Antidumping Proceedings*, 77 Fed. Reg.

36481 (June 19, 2012) ("*Methodological Change*"), 36482.  Commerce stated that in accordance

with this practice, it would reduce a respondent's EP or CEP accordingly by the amount of the tax,

duty, or other charge paid, but not rebated.  *Id.*; *see also IDM* at 5-6.  Specifically, for the *Final*

*Results* Commerce stated:

> In a typical VAT system, companies do not incur any VAT expense
> for exports; they receive on export a full rebate of the VAT they pay
> on purchases of inputs used in the production of exports ("input
> VAT"), and, in the case of domestic sales, the company can credit the
> VAT they pay on input purchases for those sales against the VAT
> they collect from customers. *See, e.g.*, explanations in *Diamond
> Sawblades* and accompanying IDM at cmt 6, *Wood Flooring from
> China* and accompanying IDM at cmt 3, *Methodological Change*, 77
> Fed. Reg. at 36483. That stands in contrast to the PRC's VAT
> regime, where some portion of the input VAT that a company pays
> on purchases of inputs used in the production of exports is not
> refunded. *See Letter to the Department from Golden Dragon* "Section
> C Questionnaire Response, Seamless Refined Copper Pipe and Tube
> from China" ("Section C Response") (April 7, 2014) at Exhibit C-13;
> *see also Letter to the Department from Golden Dragon*
> "Supplemental Section A, C, & D Questionnaire Response, Seamless
> Refined Copper Pipe and Tube from China" (July 10, 2014) at
> Exhibits SC-9 through SC-13; *see also Methodological Change*, 77
> FR 36483. This amounts to a tax, duty or other charge imposed on

exports that is not imposed on domestic sales, and thus we disagree with respondent's assertions that irrecoverable VAT should not be deducted from their U.S. prices. Where the irrecoverable VAT is a fixed percentage of U.S. price, the Department explained that the final step in arriving at a tax-neutral dumping comparison is to reduce the U.S. price downward by this same percentage. *Id*.

\* \* \*

Information placed on the record of this review by Golden Dragon indicates that, according to the PRC VAT schedule, the standard VAT levy on the subject merchandise is 17 percent and the VAT rebate rate for the subject merchandise is 13 percent. *See* Supplemental Section A, C, & D Questionnaire Response (July 10, 2014), CDoc 33, 14. For the final results, therefore, we removed from the U.S. price an amount calculated based on the difference between these rates (i.e., four percent) applied to the export sales value, consistent with the definition of irrecoverable VAT under PRC tax law and regulation. *See Prestressed Steel from China* and accompanying IDM, at cmt 1.

Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods. *Id*., at cmt 1, n. 35. The first variable, export value, is unique to each respondent while the rates in (2) and (3), as well as the formula for determining irrecoverable VAT, are each explicitly set forth in Chinese law and regulations. *Id*., at cmt 1, n. 36.

*IDM* at 5-6. Commerce determined that Golden Dragon, a bonded processor, used both imported and domestically sourced copper to produce subject merchandise. *Id*. at 7; *see* Supp. Questionnaire Response (July 10, 2014) ("SQR1"), 13; *see* Section D Resp. at Exs. D5-D6; *see also* SQR at Exs. SD-15. Golden Dragon averred in its administrative submissions that it would be liable to pay VAT on domestically sourced copper, even if this copper was used to produce subject merchandise destined for the United States. *See IDM* at 7-8; *see also* SQR1 at 13. Commerce further determined that Golden Dragon was unable to sufficiently demonstrate that only raw materials imported under

bond, *i.e.* those materials exempt from the VAT, were used in the production of subject merchandise. *IDM* at 8; *see* Sec. D Resp. at Ex. D-2; *see also* SQR1 at Ex. SD3. Commerce stated that it required that a respondent substantiate any claimed exemption to the PRC VAT regulations according to those regulations. *IDM* at 7. Commerce further explained that Golden Dragon took contradictory positions during the hearing held on the issue; Golden Dragon asserted during the hearing that both domestically sourced and imported copper would be exempt from VAT, and further argued that it was exempt from the VAT because a greater quantity of exempt material was brought into the bonded facility than was exported to the United States. *Id.* at 7-8. Both of these assertions, Commerce stated, stand in opposition to record evidence on irrecoverable VAT and the purchase and inventory records provided by Golden Dragon. *Id.* Finally, Commerce determined that Golden Dragon only selectively translated the relevant VAT regulations, despite Commerce's request for the regulations to be fully translated. *Id.* at 8. Ultimately, Commerce "continued to adjust U.S. price by the amount of irrecoverable VAT (*i.e.*, four percent) . . . because Golden Dragon has provided no evidence or support for adjusting these rate[s] for the consumption of in-bond material pursuant to the PRC VAT regulations." *Id.*

Golden Dragon does not argue with the fundamental rationale behind reducing the EP or CEP by the percentage of irrecoverable VAT, *see* Def.'s Resp. at 8; instead, Golden Dragon's claim is that the PRC's VAT is not included in the price of its exported merchandise not merely as a matter of law but as a matter of fact, as Golden Dragon is exempt from paying the VAT on the copper cathode it imports, under bond, into its bonded processing facility. *See generally* Pl's Br. at 3-6. Golden Dragon supports its claim of exempt status with a translated copy of its exemption declaration from PRC Customs, effective from December 2012 through June 2014, covering the

POR.  SQR1 at Ex. SC-11.  According to Golden Dragon, this declaration shows that its import and

export value have been "written off" by PRC Customs, and that its import and export status is "free",

meaning that no VAT was owed or collected upon Golden Dragon's imports of copper used in the

processing of its exports.  Pl's Br. at 12; *see IDM* at 8; SQR1 at Ex. SC-11.

   Golden Dragon further supports its exemption claim with partially-translated copies

of PRC VAT regulations stating that under Article 5 of PRC Customs Regulation 168, entitled

"Measures of the Customs of the PRC for the Supervision and Administration of Processing Trade",

Golden Dragon qualifies for the VAT exemption by importing copper cathode into its bonded

processing facility and producing copper tubes for export.  *See* Golden Dragon's Supp.

Questionnaire Response (Oct. 3, 2014), CDocs 58-62 ("SQR2"), 5.  Golden Dragon avers that

Article 5 of Regulation 168 provides,

> Approved by the Customs, materials and parts imported under
> processing trading are bonded supervision after exports of finished
> products, it will be written off by the Customs in accordance with the
> approved actual processing export quantity; for those imports that
> have been collected tax according to the regulations, after finished
> products export, the Customs will refund the taxes according to the
> approved amount of the actual processing export.

*See* Pl's Br. at 12.  Golden Dragon contends that in this case, Commerce has applied a theoretical

VAT and reduced the CEP by a theoretical amount while ignoring record evidence that Golden

Dragon did not owe and has not paid VAT on its exported subject merchandise.  It argues that

Commerce is obligated to consider evidence of its exemption, as laid out in *Methodological Change*.

*See Methodological Change,* 77 Fed. Reg. at 36483 ("[Commerce] will also consider evidence as

to whether the particular respondent(s) was, in some manner, exempted from the requirement to pay

the export tax, duty, or charge. [Commerce] anticipates that such evidence would include official

documentation of the respondent's exemption."). Golden Dragon points to its exemption declaration and the translations of the PRC regulations to demonstrate its VAT exempt status as a bonded processor.

Golden Dragon also contests Commerce's basis for rejecting its exempt status by determining that Golden Dragon failed to segregate its imported VAT-exempt and non-VAT-exempt copper cathodes during the production process. *See* Pl's Br. at 21-22; *see also IDM* at 4. Golden Dragon argues that, according to the PRC regulations, if the volume of its imported VAT-free copper cathodes meets or exceeds its volume of exported U.S. copper tubes, it has met its requirement for VAT exemption for the exports. Pl's Br. at 21; SQR1; Pl's Pre-Preliminary Comments (Nov 13, 104), CDoc 68; Pl's Admin. Case Brief (Jan.7, 2014), CDocs 75-77 (stating, *i.e.*, "[d]uring the POR . . . the quantity of copper that Golden Dragon imported under bond, for which it was fully VAT exempt, substantially exceeded the quantity of its total POR U.S. sales").

The government responds by contending Golden Dragon "did not provide sufficient evidence to show that it avoided the four percent irrecoverable VAT rate set forth under [PRC] law." Def.'s Resp. at 11. The government rejects Golden Dragon's argument that because it imported more copper under bond than needed to produce the subject merchandise, the U.S.-exported subject merchandise is exempt from VAT, arguing instead that because Golden Dragon cannot "trace" the imported VAT-exempt copper through its production lines and verify that only VAT-exempt inputs went into the production of the subject merchandise, Commerce continued to apply the 4 percent reduction to the CEP of the exported subject merchandise. Def.'s Resp. at 13-14.

## B. Discussion

A basic premise of Commerce's stated practice in applying certain reductions in price owing to an export tax, duty, or other charge is that the amount of that export tax, duty or other charge is included in the EP or CEP.  *See* 19 U.S.C. §1677a(c)(2)(B) ("if included in such price"); *see also Methodological Change*, 77 Fed. Reg. at 36482 ("[Commerce] will determine whether, as a matter of law, regulation, or other official action, the NME government has imposed 'an export tax, duty, or other charge' . . . that is not fully refunded upon exportation").  If Commerce cannot determine that the EP or CEP includes the export tax, duty or other charge, then Commerce need not seek to reduce the EP or CEP by the amount of that export tax, duty, or other charge.  *See id*.  Here, Commerce has failed to sufficiently explain its reasoning supporting its determination that the VAT is included in the CEP for Golden Dragon's copper tube exported to the U.S.  Instead, Commerce relies upon its initial assumption that the 4 percent VAT was paid or included and was not recovered, without due regard to Golden Dragon's exemption documentation or its arguments regarding how the PRC regulations affect the VAT "payment" accorded to Golden Dragon's import volumes as compared with its export volumes.  *See IDM* at 7.  In the *Final Results*, Commerce stated:

> Golden Dragon argued that it simply had to demonstrate to the PRC government that the quantity of raw materials imported into its bonded facility exceeds that of its exports to qualify for a total VAT exemption on all of its exports.  While Golden Dragon's claim, if true, may satisfy the requirements of the PRC government to qualify Golden Dragon for an exemption to paying VAT on its exports, the Department requires that a respondent substantiate any such claimed adjustment according to the PRC VAT regulations.

*Id.*   Commerce does not explain how Golden Dragon failed to substantiate its argument in accordance with its own statement; Commerce merely reiterates its finding that Golden Dragon used both domestically sourced and imported copper during the POR in the production of subject merchandise, a fact that does not necessarily obviate Golden Dragon's argument.  To the court's mind, Commerce's method for its VAT determination appears straightforward: if Golden Dragon's argument is true, *i.e.*, if it has satisfied the requirements under the PRC regulations, and (as Commerce stated) if Golden Dragon can substantiate its argument before Commerce, Commerce will recognize Golden Dragon's VAT exemption on the subject merchandise.

Commerce does not sufficiently explain how Golden Dragon's submissions failed to substantiate said PRC requirements.  Indeed, the court is hard pressed to conceive of what, if any, additional information Golden Dragon could provide to demonstrate that it has met Commerce's stated requirements.  Accordingly, the court cannot find Commerce's determination to be based on substantial evidence, and the matter must therefore be, and hereby is, remanded to Commerce either to further explain how Golden Dragon has failed to substantiate having met its burden under the PRC VAT regulations to qualify for the VAT exemption, or to reconsider the issue anew, with, as always, the discretion to re-open the record if that is a necessary consequence of this opinion.

II. *By-Product Offset and Surrogate Overhead Calculations*

A. Background

In NME antidumping duty cases, Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise." 19 U.S.C. §1677b(c)(1). When determining the normal value ("NV") of subject goods from a NME such as the PRC, Commerce makes its calculation based on surrogate values

("SV") on the basis of the value of the factors of production ("FOP") used in producing the merchandise. *Id.* To value FOPs, Commerce must base its determination(s) on the "best available information", and Commerce's practice is to select values that are "publicly available, non-export average values, most contemporaneous with the POR, product-specific, and tax-exclusive." *Id.*; *see also IDM* at 14.

In calculating NV in the NME context, "the particular aim of the statute is to determine the non-distorted cost of producing the subject merchandise." *DuPont Teijin Films China Ltd. v. United States*, 38 CIT ___, ___, 7 F. Supp. 3d 1338, 1345 (2014), referencing *Lasko Metal Prods., Inc. v. United States*, 16 CIT 1079, 1081, 810 F. Supp. 314, 316-17 (1992). "Nowhere does the statute speak directly to any methodology Commerce must employ to value the factors of production, indeed the very structure of the statute suggests Congress intended to vest discretion in Commerce by providing only a framework within which to work." *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 481, 59 F. Supp. 2d 1354, 1357 (1999); *see also* 19 U.S.C. §1677b(c) (no particular method prescribed for valuing FOPs in the NME context).

When valuing FOPs, Commerce typically assigns a surrogate value to recycled inputs like it would any other raw material input.   However, double counting of input costs can occur if Commerce assigns a value to the raw material and then another cost to the recycled material without providing some sort of offset to account for the fact that the recycled material did not need to be purchased. *DuPont Teijin*, 38 CIT at ___, 7 F. Supp. 2d at 1345-46. Commerce's recent practice with regard to avoiding double counting recycled by-product inputs has been to grant the producer a by-product offset or credit for by-products generated during production that are either sold or

reintroduced into production.  *See, e.g., Guangdong Chemicals Imp. & Exp. v. United States*, 30 CIT 1412, 1426, 460 F. Supp. 2d 1365, 1376 (2006) (applying a credit for by-products made during production of sebacic acid).

Golden Dragon's copper tube is produced from copper cathodes; according to Golden Dragon, copper is extremely valuable and Golden Dragon operates its production process to recycle virtually all possible copper scrap generated throughout the process by recovering scrap, reentering it into raw material inventory, and remelting it.  *See* Golden Dragon's Supp. D Resp. (April 16, 2014), PDoc 32 ("SDR") at 15 and Ex. D-8; *see also* Golden Dragon's Supp. Resp. (July 11, 2014), PDoc 70 at 24-26 and Ex. SD-20.  At the onset of the administrative review, Golden Dragon took the position that this recycled copper was not a by-product.  *See* SDR at 15; *see also IDM* at 12.

In the *Preliminary Results*, Commerce granted a by-product offset for several by-products, including the reclaimed and reintroduced copper scrap.  Prelim IDM at 18.  In the *Final Results*, Commerce continued to grant a by-product offset for the recycled copper scrap, basing its determination to do so on several findings: (1) Golden Dragon provided detailed inventory records demonstrating the amount of recovered copper scrap and detailing the recycling process, (2) Golden Dragon's record evidence mirrors its evidence provided in the second administrative review, where Commerce also granted a by-product offset for recycled copper, *Copper Pipe and Tube from the PRC*, 79 Fed. Reg. 23324 and accompanying issues and decision memorandum at cmt 2, and (3) Golden Dragon has provided actual quantities of recycled copper scrap during the POR which allows for the calculation of a specific by-product offset.  *IDM* at 13.

Golden Dragon contests two aspects of Commerce's application of the by-product offset.  It argues that instead of applying the offset as a deduction from NV, Commerce should have

deducted the offset from the direct material costs.  Pl's Br. at 26.  Golden Dragon further contests

the calculation and application of the surrogate financial ratios, which Golden Dragon claims

resulted in an overvaluation of the overhead costs.  *Id*. at 26-28.

Commerce responds that in granting Golden Dragon a by-product offset for copper

that Golden Dragon reintroduced into the production process and applying that offset to NV, it

followed "well-established practice and the methodology employed in the *Preliminary Results* and

in the preceding review of this order." Def.'s Resp at 22.  Commerce states that its practice in NME

proceedings is to deduct the by-product offset from NV, not from raw materials.  *Id*. at 23,

referencing *Polyethylene Terephthlalate Film, and Strip from the PRC*, 77 Fed. Reg. 14493 (Mar.

12, 2012) (PET Film from China) and accompanying issues and decision memorandum at issue 9.

B. Exhaustion

As a threshold matter, Commerce contends Golden Dragon failed to exhaust

administrative remedies by not raising the matter of the by-product calculation methodology when

it had the chance.  *See* 28 U.S.C. §2637(d) (the court "shall, where appropriate, require the

exhaustion of administrative remedies"); *see*, *e.g.*, *Sandvik Steel Co. v. United States*, 164 F.3d 596,

599 (Fed. Cir. 1998) ("no one is entitled to judicial relief for a supposed or threatened injury until

the prescribed administrative remedy has been exhausted") (citation omitted). Commerce's full

reasoning is described below:

> In the Preliminary Results, consistent with the offset granted Golden Dragon in the
> prior review, Commerce applied Golden Dragon's byproduct offset for recycled
> copper to normal value.

* * *

However, despite Commerce's explicit methodological determination in its Preliminary Results to apply the byproduct offset to normal value, Golden Dragon declined to argue in its administrative case brief that Commerce should instead apply the offset to direct material costs rather than to normal value. *See* Golden Dragon Case Br., P.R. 112-13. In fact, in its rebuttal brief, Golden Dragon argued that Commerce should leave untouched the recycled copper byproduct offset to normal value. Golden Dragon Rebuttal Br., P.R. 115, at 9 (labeling Commerce's Preliminary Results "entirely supported by the record, consistent with the statute, and in line with the Department's conclusions in the original investigation, first and second reviews of this case"). Golden Dragon made this argument in response to petitioners' argument that Commerce should not grant Golden Dragon any byproduct offset on the basis that Golden Dragon did not request specifically such an offset and did not report copper byproducts on a CONNUM-specific basis. Petitioners' Case Br. at 13-14, C.R. 78. Thus, in essence, Golden Dragon now disputes the copper byproduct offset that it argued for and received from Commerce over petitioners' objections.

Having failed to exhaust the issue administratively, Golden Dragon raised the issue for the first time in a post-Final Results ministerial error allegation. At that late stage, Golden Dragon argued for the first time that in offsetting recycled copper from normal value rather than the direct material cost, Commerce committed a clerical error within the meaning of section 351.224(f) of Commerce's regulations. Ministerial Error Allegation at 1-2 (arguing that because Golden Dragon reintroduced copper scrap into the production process, it is mathematically incorrect to deduct the offset from normal value). In its Ministerial Error Allegation Memorandum, Commerce explained that its deduction of the recycled copper byproduct offset from normal value constituted a methodological determination that, moreover, adhered to Commerce's consistent practice. *Id.* at 4-6. Thus, Golden Dragon did not identify a "ministerial error" as defined in Commerce's regulations. *Id.* (citing 19 U.S.C. §351.224(f)).

Although Golden Dragon tried to cloak its argument as a clerical error, its allegation exclusively pertained to a methodological decision evident in Commerce's Preliminary Results and in the prior review of this order. See Ministerial Error Memo at 2-4. This Court has refused to "allow Plaintiffs to make an end run around the exhaustion requirement by entertaining an unexhausted substantive issue disguised as a ministerial error." *Fischer S.A. Comercio, Industria & Agricultura, et al. v. United States*, 885 F. Supp. 2d 1366, 1376 (Ct. Int'l Trade 2012). Thus, "ministerial error procedure is not the appropriate method to raise a new, substantive legal argument." *Id.* (rejecting for failure to exhaust an argument on the exclusion of home market sales outside the period of review, which plaintiffs raised in a ministerial allegation but not their administrative case brief) (citing 19 U.S.C. § 1673d(e)[)]; *see also Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 342 F. Supp. 2d 1191, 1205 (Ct. Int'l Trade 2004). In sum, Golden Dragon did not preserve

its byproduct offset argument through its ministerial error allegation, and the Court should deny Golden Dragon's attempt to cure its failure to exhaust by label[ ]ing its argument as a ministerial error allegation.

The exceptions to the exhaustion requirement do not apply here, nor does Golden Dragon attempt to invoke any. Commerce's determination did not involve a purely legal question and was not altered by an intervening judicial opinion. In addition, the exception for futility does not apply because there is no indication that Golden Dragon would have been "required to go through obviously useless motions in order to preserve {its} rights." *See Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007). To preserve the issue for appeal, Golden Dragon needed to include the issue in its administrative case brief to Commerce. Golden Dragon did not. Consequently, Golden Dragon denied Commerce the opportunity to administratively evaluate and address this issue, and Golden Dragon should not be permitted to belatedly raise the issue now.

Def.'s Resp. at 25-27.

Golden Dragon replies that it had no opportunity to brief the precise issue before the court prior to the *Final Results*, because in making the methodological determination to treat Golden Dragon's recovered and recycled copper as raw material, which it did for the *Preliminary Results*, Commerce modified the *Preliminary Results*' methodology for the *Final Results* by "building up" the total costs using copper quantities net of recovered and recycled copper. *Compare* Prelim. Analysis Memo, CDoc 72 at 7, *with* Final Analysis Memo, CDoc 83 at 7-8. By contrast, in the *Final Results*, Commerce announced its change, described it as "new," and even noted the final number it used was not in the cost database:

Golden Dragon did not include its recycled copper in the calculation of its copper consumption ratio. Therefore, the Department took Golden Dragon's total copper consumption, including recycled material . . . and divided it by the total production of subject merchandise . . . , which results in a new consumption rate . . . Because this consumption rate is not included in Golden Dragon's FOP database, it was used in place of the reported consumption rate for copper.

Final Analysis Memo, CDoc 83, at 7-8 (footnotes omitted). Commerce inserted its newly calculated

copper factor into the calculation of Golden Dragon's copper costs, then input that figure into the

total cost of manufacturing calculation, which was then input into the normal value calculation.

The doctrine of exhaustion does not apply where, after a party's case brief has been

filed, Commerce' position fundamentally changes in a manner that the party could not have

anticipated prior to filing its case brief. *See, e.g., Corus Staal BV v. United States*, 502 F.3d 1370,

1381 (2007). Here, Commerce relied on Golden Dragon's reported copper consumption ratio for

the *Preliminary Results*. The fact that Commerce then rejected using that ratio and instead resorted

to its own, new calculation of that ratio gave rise to a right to challenge the rejection of that ratio.

Golden Dragon claims it attempted to challenge the rejection of that ratio via a

"ministerial error" allegation as the only administrative avenue open to it after issuance of the *Final

Results*. Pl's Reply at 14-16. Golden Dragon need only have appealed that rejection as part of its

challenge here, but the problem before the court appears to be more than a mere challenge to that

rejection. Instead, Golden Dragon is essentially challenging Commerce's methodology itself, as

described in its reply brief:

> The issue of where to apply the by-product offset is critical to accurately calculate
> Golden Dragon's margin. A simplified hypothetical best illustrates the point. Assume
> that Golden Dragon has one component in its costs, raw materials, for a total cost of
> $100; the value of its by-product is $2; and the surrogate financial ratios are 10%.
> Golden Dragon's position is that first the total cost of manufacturing should be
> calculated by subtracting $2 from $100 to arrive at $98 because, per Commerce's
> description, the by-product has a commercial value of $2 and could be sold for this
> amount thereby reducing Golden Dragon's costs of producing the product. Indeed,
> the by-product (i.e., the recovered raw material) is a direct offset to Golden Dragon's
> raw material cost and thus Golden Dragon's cost of manufacturing. The normal value
> calculation would then proceed as follows: COM of $98 x surrogate financial ratio
> of 10% equals 9.8 + 98 = 107.8.

Applying the methodology that Commerce used in this case to the above example results in a significantly different normal value based on an artificial increase in Golden Dragon's costs. Specifically, because Commerce did not deduct the value of the by-product from the cost of manufacturing, the Final Results methodology was: COM of $100 x surrogate financial ratio of $10\% = 10 + 100 = 110$, and then subtract the $2 by-product to arrive at a normal value of 108. Golden Dragon notes that this difference using the actual consumption rate and ratios amounted to more than $[ 1 million ] in additional dumping duties in the underlying review. The methodology that Golden Dragon puts forward above reflects Commerce's methodology in the market economy context, as Golden Dragon noted in its initial brief.

* * *

As described above, in the NME context, Commerce multiples the company's COM by the surrogate financial ratio, which means that the proper placement of the offset affects the entire calculation. The surrogate financial ratios are based on costs exclusive of reused materials. It follows that Commerce should apply these ratios to Golden Dragon's costs that are calculated on the same basis. But it did not. Instead, it applied surrogate ratios to Golden Dragon's costs that included not only direct materials (original copper) but also the quantity of recovered copper.

The result is an inflated amount of SG&A and profit and therefore an inaccurate and inflated margin. Importantly, the recovered coper is copper that has already been input into the production process (as cathode, purchased scrap, or phoscopper), been recovered, and been subsequently reintroduced into the production process and remelted. This is not new material but material simply being recycled from copper already in the plant and part of the production loop. When Commerce calculated Golden Dragon's costs, it included the quantities of the new copper material and also the recovered copper.

Commerce then calculated the selling, general and administrative expenses ("SG&A"), and profit ratios from the 2013 audited financial statement of the surrogate country producer, Furukawa Metal (Thailand) Public Company Ltd. P.R. 124, 2012-2013 *Administrative Review of the Antidumping Duty Order on Seamless Refined Copper Pipe and Tube*, Final Results Surrogate Value Memo (May 29, 2015) at 5. Furukawa's audited financial statement, relied on by Commerce for the ratio calculations, does not indicate that recovered and reintroduced copper is separately added to its raw material cost. Yet, Commerce applied these surrogate ratio calculated for Furukawa to a Golden Dragon cost figure that, by contrast, includes direct materials (new copper) plus the quantity of recovered materials. Put simply, Commerce applied the surrogate ratios calculated on one basis to a Golden Dragon cost that it calculated on a different basis. The result is inflated amounts for SG&A expenses and profit and thus a margin that is not supported by the record.

> There is one solution to the two errors in the by-product offset calculation: Commerce should deduct the by-product offset from Golden Dragon's direct material costs, and not from normal value. Doing so would more accurately account for the fact that the so-called by-product is a direct raw material that Golden Dragon captures and reuses and it would result in Commerce's application of surrogate financial ratios on a basis consistent with how Golden Dragon's costs were calculated.

Pl's Reply at 16-18.

## C. Discussion

The concerns Golden Dragon raises with respect to the foregoing are (1) double counting and (2) a surrogate value ratio with "mismatched" denominator and numerator. With respect to the first issue, the challenge Golden Dragon raises here goes beyond challenging Commerce's rejection of its reported consumption ratio and instead challenges the methodology used to adjust for the by-product offset, essentially arguing that Commerce should have applied its market economy by-product methodology here. Golden Dragon made no such arguments at the administrative case brief, despite having the opportunity to do so, meaning Commerce had no opportunity to address said issue at the administrative level. *See Golden Dragon's Administrative Case Brief*, PDocs 111-113, CDocs 77-79; *see also* 19 C.F.R. §351.309(c)(2) ("[t]he case brief must present all arguments that continue in the submitter's view to be relevant to the final determination"); *see also Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383 (Fed. Cir. 2008) (parties are procedurally required to raise their issues before Commerce at the same time Commerce is addressing the issue). The court must therefore conclude that Golden Dragon should have raised in its administrative case brief the challenge to Commerce's methodology that it would raise here, and it has therefore failed to exhaust the issue.

With respect to the second issue, Commerce must calculate NV based on a number of FOPs, including labor, raw materials, energy used, and the cost of capital. 19 U.S.C. §1677b(c)(3). After determining the costs of these FOPs, Commerce must also add "an amount for general expenses and profit plus . . . other expenses. *Id*. §1677b(c)(1). It does so by valuing overhead, general and administrative expenses ("G&A"), and profit using non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country. 19 C.F.R. §351.408(c)(4); Prelim Results IDM at 18. Here, Commerce valued overhead, G&A, and profit using audited financial statements for the year ending December 2013 of Furukawa Metal (Thailand) Public Company Limited, a Thai producer of merchandise identical to the subject merchandise. Prelim Results IDM at 18; Preliminary Surrogate Value Memorandum, PDoc 101 ("Prelim SV Memo") at Ex. 5.

Golden Dragon claims that Commerce erred by using one denominator to calculate the overhead ratio and then applying that ratio to a denominator calculated on a different basis. According to Golden Dragon, the Furukawa statements are prepared in accordance with Thai Financial Reporting Standards, which closely follow International Financial Reporting Standards ("IFRS"). Under IFRS, according to Golden Dragon, "the costs allocated to by[-]products should be 'deducted from the cost pool, being otherwise allocated to the sole or several principal products.'" Pl's Br. at 29, citing Ministerial Error Comments (June 8, 2016), PDoc 126, Attachment 1. Golden Dragon explains that this means Furukawa's costs used as the denominator of the surrogate overhead ratio are inclusive of recovered scrap and any by-product offset. *Id*. By contrast, Golden Dragon claims that Commerce's calculation applies the Furukawa overhead ratio to Golden Dragon's cost of manufacturing, which does not reflect the by-product offset. "By multiplying the

surrogate overhead ratio by the [] cost that includes the quantity of recovered copper used as an input but not accounting for the quantity of recovered copper as an offset, [Commerce] has overstated the overhead cost." *Id*. at 30.   Therefore, Golden Dragon contends, Commerce's calculation is mathematically incorrect and must be corrected. *Id*. at 29-30.

Commerce's response is that it addressed this methodological argument in its Ministerial Error Memorandum, with reference to the explanation provided in the *Final Results*. Def.'s Resp. at 29.   Indeed, Commerce confirmed in the *Final Results* its practice to calculate overhead by multiplying the surrogate overhead ratio by respondents' cost of manufacturing. *IDM* at 11, citing *PET Film from the PRC* at cmt. 3. The overhead ratio therefore is applied to the three components of the manufacturing cost -- raw materials, labor, and energy. *Id*.   Commerce elaborated in response to Golden Dragon's ministerial error allegation that it must determine surrogate values for all inputs, including recycled inputs, to calculate overhead costs.   Ministerial Error Memorandum, PDoc 128, 5.   Commerce stated that this methodology -- multiplying the total value of all materials used in production -- prevents the overhead ratio from being understated. *Id*. The court cannot find unreasonableness in such explanation.

This court has previously upheld Commerce's by-product methodology in the NME context. *See*, *e.g., Guangdong Chemicals*, 30 CIT at 1425-26, 460 F. Supp. 2d at 1376 (respondent Guangdong argued that Commerce should have deducted the by-product offset from the cost of manufacturing, but the court held that to do so would require "costly accounting procedures" including calculating a separate overhead, SG&A and profit amount for the by-products, deducting that amount from the by-product offset, and then deducting the remaining by-product credit from manufacturing costs, and instead upheld Commerce's practice of deducting the by-product from NV

after applying the surrogate financial ratios); *Magnesium Corp. of America v. United States*, 20 CIT

1092, 1107-08, 938 F. Supp. 885, 900 (1996) (stating that Commerce's decision to deduct the by-

product offset from NV was a reasonable means of accounting for costs related to by-product

processing while avoiding costly accounting procedures not warranted for by-products).

     As Commerce explained in both the *Final Results* and the Ministerial Error

Memorandum, "overhead would still be understated if the overhead ratio is not multiplied by the

total value of all materials used in production, including the reintroduced copper."  Accordingly,

Commerce "must determine surrogate values for all inputs, including recycled inputs such as

reintroduced copper." Ministerial Error Memo at 5.  Golden Dragon does not persuade the court that

Commerce's treatment of the by-product offset and subsequent calculations using the Furukawa

financial statements is unreasonable, especially given its failure to exhaust the related issue of the

by-product deduction from NV or from cost of manufacturing.  Even if Golden Dragon's alternative

approach to Commerce's by-product methodology was reasonable, the court cannot substitute its

own view of the statute for Commerce's reasonable interpretation or implementation.  *Magnesium

Corp.,*  20 CIT at 1107-08, 938 F. Supp. at 900; *see Chevron, U.S.A. v. Nat. Res. Def. Council, Inc.*,

467 U.S. 837, 844 (1984).   The court therefore finds Commerce's reasonable determination

regarding the recycled copper by-product supported by substantial evidence.

### III.  *Surrogate Truck Freight Value*

### A. Background

     As described above, in order to value FOPs, Commerce must use the "best available

information", and Commerce's practice is to select values that are "publicly available, non-export

average values, most contemporaneous with the POR, product-specific, and tax-exclusive."   19

U.S.C. §1677b(c)(1); *IDM* at 14.  Commerce's practice in determining distances for truck freight has been to calculate a value expressing the cost of moving freight over a given distance in U.S. dollars per kilometer.  *See IDM* at 14-15.  Golden Dragon contests the distance figure determined for the truck freight SV.

In the *Preliminary Results*, Commerce first sought to value truck freight using inland transportation costs obtained from a World Bank report entitled *Doing Business 2014: Thailand*. Prelim SV Memo at 5.  However, the 2014 report did not provide a distance, which Commerce needed in order to calculate a truck freight cost that is expressed in U.S. dollars per kilometer.  *IDM* at 15.  Commerce then determined to use the distance information from *Prestressed Concrete Steel Rail Tie Wire from the PRC*, 79 Fed. Reg. 25572 (May 5, 2014) ("*Prestressed Steel*"), which the Petitioners[1] placed on the record.  *IDM* at 15, referencing the Petitioners' Submission of Factual Information in Advance of Preliminary Determination (Oct. 31, 2014), PDoc 89, 18-23 ("Pet's Factual Submission").  In that review, Commerce determined an average of the reported distances between Bangkok's Free Trade Zone ("FTZ") and the two closest ports of Bangkok and Laem Chabang (44.33 km and 110 km respectively, averaging 77.165 km[2]) to calculate a truck freight cost expressed in U.S. dollars per kilometer.  *Prestressed Steel* IDM at cmt 4.  In the *Preliminary Results* here*,* Commerce used the same distance determination from *Prestressed Steel* to calculate a preliminary truck freight SV of $0.000272144 per kilometer.  Prelim SV Memo at 5; *IDM* at 15.

---

[1] The Ad Hod Coalition for Domestically Produced Seamless Refined Copper Pipe and Tube and its individual members, Cerro Flow Products, LLC, Wieland Copper Products, LLC, Mueller Copper Tube Products, Inc., and Mueller Copper Tube Company, Inc. (collectively, "Petitioners").

[2] In *Prestressed Steel, Hand Trucks,* and *Xanthan Gum*, Commerce determined that the average of 44.33 km and 110 km was 76.67 km.

        In a sharp reversal of their earlier position, the Petitioners argued in their comments

to the *Preliminary Results* that Commerce cannot use the distances from *Prestressed Steel* because

"the factual information supporting those distances is not on the record in this proceeding." *IDM*

at 15.  The Petitioners requested that Commerce revise its SV using different distances placed on

the record by the Petitioners (a Google Maps printout) demonstrating shorter distances from Laem

Chabang port and Bangkok port to the Bangkok FTZ (*i.e.*, 86.2 km and 42.4 km respectively,

resulting in an average of 64.3 km).  *IDM* at 15; Pet's Factual Submission at 22-23; *see also* Final

Results Surrogate Value Memorandum, PDoc 124, 5-6.  In the *Final Results*, Commerce agreed with

the Petitioners, determining that "the factual information supporting [the average distance of 77.165

km as determined in *Prestressed Steel*] is not present on the record in this proceeding, because it is

not included in the *Doing Business 2014: Thailand* report, nor any of the other SV submissions

placed on the record by interested parties." *IDM* at 15.  Commerce thus determined to use the 64.3

kilometer average supported by the Petitioners' Google Maps printout and therefore revised its truck

freight SV to $0.000326594 per kilometer.  *IDM* at 15.

        Golden Dragon contests this revision, arguing that Commerce improperly calculated

the truck freight SV in the *Final Results* by using data inconsistent with prior cases and with this

review's record.  Pl's Br. at 33.  Golden Dragon contends that Commerce should use the average

distance underlying the *Doing Business 2013: Thailand* report because that information was

properly placed on the record here and the use of those distances is supported by at least three recent

Department decisions.  Pl's Br. at 33, citing *Final Determination of Sales at Less Than Fair Value:*

*Prestressed Concrete Steel Rail Tie Wire From the People's Republic of China*; 79 Fed. Reg. 25572

(May 5, 2014) and accompanying IDM, at cmtt 4 ("*Prestressed Steel*"); *Xanthan Gum from the*

*People's Republic of China: Preliminary Results of 2013 Antidumping Duty New Shipper Review*, 79 Fed. Reg. 78797 (Dec. 31, 2014) and accompanying *Preliminary Surrogate Value Memo*, at 10 ("*Xanthan Gum*"); *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011–2012*, 79 Fed. Reg. 44008 (Jul. 29, 2014) and accompanying IDM, at cmt 8 ("*Hand Trucks*").  Golden Dragon argues that Commerce has consistently and repeatedly found that the data adopted in *Prestressed Steel* is the best available information for calculating the truck freight SV and that the distances relied upon in *Prestressed Steel* "sufficed as factual information" for the truck freight SV calculation.  Pl.'s Br. at 33-34. Therefore, according to Golden Dragon, because the *Prestressed Steel* determination is properly on this record and Commerce properly relied upon those figures for the *Preliminary Results*, Commerce should use the *Prestressed Steel* figures in determining the truck freight SV.

The government agrees with the Petitioners, arguing that substantial evidence supports Commerce's determination to use the distance information submitted by the Petitioners in their comments to the *Preliminary Results*.  Def.'s Resp. at 18.  The government avers that no factual information exists on this record to support the average distance of 77.165 km.  Def.'s Resp. at 18; *IDM* at 15 (averring that *Doing Business 2014: Thailand* does not contain measurements for the distance between Bangkok's FTZ and either Bangkok port or Laem Chabang port).  Further, the government argues that the factual information underlying *Doing Business 2013* report was not properly submitted as record evidence for this review, reiterating the propositions relied upon by the Petitioners from *Clearon* and *Gourmet Equip*.  *Clearon Corp,* Slip Op. 14-88, 38 CIT ___, ___, 2014 WL 3643332 (July 24, 2014), *14; *Gourmet Equip. (Taiwan) Corp. v. United States*, Slip Op. 00-78, 24 CIT 572, 577-78 (July 6, 2000); Def.'s Resp. at 18-19.  The government further argues that

Golden Dragon "overlooks a key difference" between this review and those cited by Golden Dragon,

chiefly, that in those earlier reviews, either record evidence supported that average distance or

Commerce lacked a competing average distance supported by record evidence. Def.'s Resp. at 19-

20. The government concludes by arguing that while Commerce may choose to supplement the

administrative record, it is in no way compelled to do so here. *Id.* at 21.

## B. Discussion

When determining the "best available information", Commerce's practice is to select

values that are "publicly available, non-export average values, most contemporaneous with the POR,

product-specific, and tax-exclusive." 19 U.S.C. §1677b(c)(1); *IDM* at 14. Commerce has "wide

discretion" to use the best available information to value FOPs in NMEs, *Ad Hoc Shrimp Trade*

*Action Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010), though "the selection of the

best available information must be consistent with the overall purpose of the antidumping statute,

which is to determine margins as accurately as possible." *Changshan Peer Bearing Co. v. United*

*States*, 38 CIT ___, ___, 953 F. Supp. 2d 1354, 1358 (2014), citing *Lasko Metal Products, Inc. v.*

*United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (quoting *Rhone Poulenc, Inc. v. United States*,

899 F.2d 1185, 1191 (Fed. Cir. 1990)) (internal quotations omitted). Further, the court will sustain

Commerce's selection provided Commerce's reasoning adequately explains its choice. *See Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Each segment of an

antidumping proceeding is treated as an independent proceeding with a separate record, *E.I. DuPont*

*de Nemours & Co. v. United States*, Slip Op. 98-07, 22 CIT 19, 32 (Jan. 29, 1998), though prior

determinations can and often do inform Commerce's determinations in later or related proceedings.

*See also, e.g., Tri Union Frozen Products, Inc. v. United States*, Slip Op. 16-33, 40 CIT ___, ___,

(Apr. 6, 2016) ("Commerce's reliance upon previous determinations that have helped develop its practice . . . does not, as a result, incorporate the sources or information from the record of that proceeding to the instant review").

Golden Dragon's argument may be characterized as an assertion that because Commerce used the information from *Prestressed Steel* in other recent reviews to determine the distance figures for truck freight in Thailand, it must use that information here.  Golden Dragon misstates Commerce's obligation.  In *Prestressed Steel*, the underlying factual information was properly placed on the record from two independent sources, *Doing Business 2013: Thailand* World Bank report and, apparently, www.thailand.com.  *Prestressed Steel* IDM at cmt 4.  However, here, the Petitioners placed the *Prestressed Steel* determination on the record without also placing the supporting factual information from *Prestressed Steel* on the record (i.e., the *Doing Business 2013*: *Thailand* report and the website information which supported the *Prestressed Steel* determination). Instead, this review's factual record information regarding distances appears to consist of *Doing Business 2014: Thailand*, which the government avers does not contain distance information, and the Google Maps printouts, which the government avers support an average distance figure of 64.3 km.  *IDM* at 15 ("factual information supporting [the average distance of 77.165 km] is not present on the record in this proceeding, because it is not included in the *Doing Business 2014:Thailand* report, nor any of the other SV submissions placed on the record by interested parties.").  While Golden Dragon may lament Commerce's determination, it offers no other choice of factual record information in this review to support its claim.  *See generally* Pl's Br. at 33-37 and Pl's Reply at 18-21 (offering only the information underlying the *Prestressed Steel* determination as a basis for Commerce's determination here).

Golden Dragon further calls upon Commerce to supplement the record with the underlying factual information from *Prestressed Steel*.[3]  However, while Commerce may choose to supplement the record, "[t]he interested party who is in possession of the relevant information has the burden of establishing . . . the amount and nature of a particular adjustment".  19 C.F.R. §351.401(b)(1); *see also QVD Food Co. v. United* States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("the burden of creating an adequate record lies with [interested parties] and not with Commerce"), quoting *Tianjin Mach. Import & Export Corp. v. United States*, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992) (internal quotes omitted).  Golden Dragon had ample opportunity to place its preferred factual information on the record and failed to do so.  *See QVD Food Co.*, 658 F.3d at 1324 ("QVD is in an awkward position to argue that Commerce abused its discretion by not relying on evidence that QVD itself failed to introduce into the record").  The court will not re-weigh the evidence presented to Commerce, and will uphold Commerce's determination provided its determination is supported by substantial evidence on the record.  *Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999). The court finds Commerce's determination supported by substantial evidence.

---

[3] Golden Dragon's reliance upon *Clearon* for this proposition is misguided.  *See* Pl's Br. at 35-36.  In *Clearon*, Commerce had purportedly relied upon a World Bank report for use in its determination without making that report available on the record, and this court remanded the issue back to Commerce to place data that it relied upon in making its determination on the record. *Clearon Corp.*, 2014 WL 3643362 at*14.  Here, a distinct situation exists: Golden Dragon seeks to compel Commerce to use information that Commerce avers is not present on the record.  As explained above, Golden Dragon seems to misunderstand Commerce's obligation in supplementing the administrative record.

IV.  *Conclusion*

For the foregoing reasons, Commerce's *Final Results* are hereby remanded in part for Commerce to further explain or reconsider the application of a VAT adjustment to Golden Dragon's export price.  Commerce shall file its remand results by October 21, 2016.  Within ten days or sooner of the filing of those remand results with the court, the parties shall confer and report on proceeding further on the case, including a proposed scheduling order for further comments, if necessary.

**So ordered.**

Dated: July 21, 2016                      /s/ R. Kenton Musgrave_____
           New York, New York                 R. Kenton Musgrave, Senior Judge